Judicial District. I believe that Judge Goodwin is here with us on the telephone. Judge Goodwin, can you hear us? That is right. I hear you well. Okay, and we can hear you very well. We are taking this as a comeback case. We've seen it once before, and here we are again.  I don't know whether in more congenial circumstances for you, but we very much liked hearing it in Alaska the first time around. We've read your briefs. We've read your papers. We're looking forward to your argument when you're ready. May it please the Court, my name is Nazzie Simel. I'm here today on behalf of the Anchorage District Attorney's Office, probably hereinafter referred to as the State Defendants or the State, just for conveniences purposes. This Court should hesitate or not, rather, find that there is a Federal constitutional right to post-conviction DNA testing. You can't create the right out of whole cloth. Someone would have to look to existing rights as the source. There is no right to claim that newly discovered evidence warrants a new trial in habeas proceedings, according to Townsend v. Swain. So that's not a basis for conducting discovery. It is, however, a ground for relief under State law, but that's a question of State law. Campbell v. Blodgett and this Court's, which is also this Court's decision, and Bidiger v. Woodford hold that there is no right to discovery in a Federal habeas proceeding. Of course, this is not a Federal habeas proceeding. Yes, I understand that. But if one's seeking to test evidence, there needs to be a purpose for it, because there shouldn't be a Federal constitutional right that's meaningless. And so that if one then would look at perhaps Herrera, which has not yet suggests that there could be, but the Supreme Court has not yet held that there is a freestanding right to claim factual innocence as a basis for Federal habeas proceedings. And haven't we held that before you decide that issue, you have to get all the facts and you have to develop all the facts to determine whether you have a freestanding right? That's not exactly correct. My understanding of Carragher is that this Court has found that it is likely the United States Supreme Court will adopt a freestanding claim of innocence. But it has not yet done so. You're familiar with our Majoy case? Excuse me? Majoy, M-O-J-O-Y. No, I am not. Okay. Well, then we can't discuss it. But let's assume that we might have said that you have to develop the facts before you determine whether it's an actual innocence claim that can be made. And if that's the case, how do we develop the facts in this case if you can't get access to DNA evidence that was never tested to the specification standards that are exhibited today which would conclusively prove who the donor of the DNA was? I understand what you're saying, but I think you're making some assumptions that aren't warranted based on that. What assumptions have I made there? I'd like to be corrected. Okay. First of all, you're assuming that there is no vehicle at all, and that's simply not true. No vehicle? No means. No avenue, if you would. The state courts, the Alaska Court of Appeals, has adopted a procedure and a standard whereby, by judicial law, whereby offenders can seek access to the evidence. So that's not by proving actual innocence. Not exactly correct. By showing that if the test results were exclusionary, which means if the test results show that Mr. Osborne was not, could not have been a source of the semen, then showing that the significance of those would establish actual innocence. That's what the standard is. It's not based on, gee, we don't know what the test results are. That's not the basis for the standard adopted by the Alaska courts. It's a huge distinction. It doesn't depend upon the test results to establish the standard. That's a very big distinction. It's one worth making. When the Alaska court says, under Alaska law, you get it if it's exculpatory and approves actual innocence, what does the Alaska court mean by actual innocence? Because depending on how the test filters through, actual innocence can mean lots of different things. Yes. I understand that. So what's the Alaska court mean under Alaska law in this context, actual innocence? Okay. The question is a little bit difficult to answer because the Alaska courts just established the standard in this case. And so it's still a developing standard. I don't want to say anything other than that. But I think it needs what it, if you read the other, it doesn't say precisely actual innocence. What it says is that the defendant was not the perpetrator. There's a slight distinction there. But I think when you take a look at the various standards that exist out there, I mean, Herrera has an extraordinarily compelling standard, plus no State means to seek redress. And that's simply not the case here. Well, don't we have the cart before the horse? First of all, we're not trying to determine what would happen in a possible habeas. I'm sorry. I couldn't hear you. Excuse me. We're not trying to determine the outcome of an actual habeas case here. This is an access case. Yes, I understand. And to a certain degree, plus or minus, however you want to construe it, we start with Brady. If this was before trial, we'd be bringing a Brady action, right? I understand that, yes. So this is a post-trial Brady attempt to look at evidence, to develop evidence to see whether or not we can bring a habeas. And so it's a question of access. What standard do you put after conviction for seeking access to evidence to develop a habeas claim? I think that's actually putting the cart before the horse. All right. Because that's assuming that Brady extends post-trial. And I think that's an assumption that's not necessarily warranted. Are you aware of our Thomas case? Yes, I am aware of your Thomas case. And I think your Thomas case is inconsistent with your other cases, more recent cases that say, one, there's no right of discovery in habeas. But even if you take a look at Thomas, I think you need to recognize it's a different situation. Thomas is a case where he was claiming an underlying constitutional violation in the proceedings that led to his trial. He was trying to excuse a procedural default, and he couldn't make the cause and prejudice showing required by habeas law. So he was trying to make the alternative showing of a gateway showing of innocence. That's a very different situation than here. Here, there is no underlying claim of error. There simply is not. And that's a very, very big distinction. And then if you take a look at Brady, if you assume. Go ahead. I'm sorry. Can I get down to brass tacks? What interest does the state of Alaska have in not finding out whose DNA this is? Okay. The answer to that is it goes back to, to some extent, some of the answers to the questions about Brady, but not entirely. One is you go simply to the costs. I understand that in this instance. It goes to the what? First, we're going to talk about costs. And I understand that Mr. Osborne. Did you say cost? Costs, yes. C-O-S-T, cost? Plural, but yes. I understand that Mr. Osborne can pay in this instance, but that's. So costs in this case are off the table. However, if you're to establish that a constitutional right exists, costs are on the table, because you can't limit such a right only to offenders who can pay. There would be equal protection problems with that kind of a holding. So saying that costs are off the table, I think, is misleading. Okay. Let's talk about this particular case. And I hear your argument that because in many instances for indigent defendants, we provide all kinds of things. I understand that. But in this case, where the defendant or the plaintiff, I should say, the criminal defendant, the plaintiff here in this civil case, is willing to pay the costs. Okay. What other interest does the State of Alaska have in not turning this over so that we can determine whose DNA it is? Well, the answer comes, it's a somewhat difficult answer, but the answer is, one, the State's interest in finality, certainly. And they're an important interest. We just decided that in Osborne 1. We said that ABS is not the only relief, and you can bring a 1983 action. So finality is off the table. I mean, is finality, what's the finality argument in Habeas? It's the same thing with this case because we've already decided in Osborne 1 you can use a 1983 action to reach and that you're not limited by a Habeas action, which you argued before that they should have brought a Habeas action. That's not the finality problem. Okay. That's not the finality argument that I'm making. I think the question is, the access to the evidence is obtained only to attack the conviction, which everyone understands. And so the State's, but the State's interest in finality are not tied to the Habeas proceeding. To say anything else is purely. But we've decided that in Osborne. We've already told you, and you've already gone back to the district court to resolve this. We said he can use the 1983 action. I'm not saying he can't use a 1983 action. So where's the finality problem? Okay. The finality problem, you're asking me why we don't want to test it. That's a different, I'm not, maybe I'm not misunderstanding. But the finality is we have an interest in someone who has been duly convicted. Someone who's been found guilty by 12 jurors, whose conviction has been affirmed by the State courts. Does that only go to what he has to show to get the relief under 1983 versus a finality issue? Aren't you arguing he's got to make some sort of showing before you can get around the finality issue? I'm not sure I understand. In other words, it's absolutely final. Forget about it. That's not what I'm saying. Well, then what is the finality question? What I'm trying to say is that the showing is much greater post-conviction because of the finality. Fine. What's the standard then? Okay. And as I say, I think if a right exists, the source has to be Herrera. And it has to be an extraordinarily compelling showing of innocence and the absence of any State court means of redress. And neither of those are satisfied here. And if you take a look at Harvey V. Horan, Judge Ludig's opinion, which is the one on which Judge Beisslein relied for finding that a right exists, he said that the right would require a showing that testing, quote, That's an extraordinarily high standard. That's very high. And to take a look at the standard that was employed by Judge Beisslein, one has to recognize that the standard he employed is extremely low. It's what he said was a favorable result, the testing, meaning the testing would show that the semen was not Mr. Osborne's, might have a significant impact on a fact finder's evaluation of guilt or innocence. That's an extraordinarily broad standard. And if that standard were correct, then it would require only a possibility of a different outcome. And if that's true, then the Federal statute that governs post-conviction DNA testing and the California statute and any other similar statutes would have to be found unconstitutional, because they require a showing of a reasonable probability of a different result. And the distinction between these standards is not inconsiderable. And for that reason, it's very important to say that it's a highly exacting standard. I would suggest the standard has to be broader than that. As Judge Ludig said in Harvey v. Horan, because that would be the absolute outer bounds, because that's the pretrial standard under Brady. And it's got to be much more exacting and demanding than that in the post-trial context. Can I bring this down to earth and talk about the facts of this case? Sure. Let's assume that we provide access. Let's assume that the semen is tested. And let's assume that it shows that it is not the semen of this particular plaintiff and was previously a criminal defendant. For the moment, for the purpose of hypothetical, it's some unknown person. Okay. Then what do we do? What's going to happen once we learn that it's not his? What's going to happen? I mean, well, that's up to Mr. Osborne what's going to happen. But I presume he would file some sort of proceeding either in state court, probably in state court, would be my assumption. It's purely an assumption on my part. Yeah, okay. That's a fair answer. Let me ask it differently without respect to procedures for a moment. How strong is the evidence of guilt against Mr. Osborne once the semen is definitively proved not to be his? Okay. The evidence of guilt still remains quite strong and for a number of reasons. First of all, you really have to remember that in this instance, Mr. Osborne had the opportunity to conduct a more discriminating DNA test. Isn't the fact that the State Examiner, though, decided not to do that more discriminating test because the sample was, had been damaged and it wasn't up to par to do that more discriminative test? The State Examiner may have made that election, but more importantly than that, Mr. Osborne's trial counsel also made that election because the State Examiner wasn't entirely sure about that. So what does that mean? And she made that decision for a tactical reason. So what does that mean in the constitutional sense of this case? Okay. What it means is a couple things. One, it means he's essentially trying to take a gambler's risk. That's the first comment I have to make. And it's a significant one. He's trying to get a second bite. Second one is he's now confessed. He's confessed on two occasions. He's confessed in his written application to the Alaska Board of Parole, and he has confessed in his testimony to the Alaska Board of Parole, and he even said that he had told some unnamed attorney that he had done it, and his mother. And he did so and signed a paper saying that any false statements made in this to the Board of Parole would qualify him for a Class A misdemeanor. Well, going back to Judge Fletcher's question, we all know about cases where false confessions are made. What if the DNA test goes even further than that? What if the hairs now come out to be the same DNA as the semen that was in the condom? So now you've got the person who used the condoms and the hair that were found on the victim's clothing and the instrumentality, the clothing was underneath the victim at the time of the rape. They all tie together. Now what would you say about that confession? I would say nothing has changed. I would say that for two reasons. Well, if she identified the person as the person who raped her, which was the passenger, and now you have her rape, all the rape equipment, if you will, has all been tested and doesn't show his DNA, so now how does the confession have anything to do with that? I'm trying to explain, if I could. One, you have his co-defendant who has on three different occasions identified him as the other rapist. One, before trial to the police. Two, at sentencing on the transcript of their joint sentencing for which he received a mitigator. And three, in his own application to the parole board. So how do you make the miracle between those testifying and the DNA that conclusively shows he didn't commit the rape? But it doesn't. That's the next point I'm getting to. All right. The next point is, one, the victim was a prostitute, and she was wearing a sweater to which hairs adhere. It was a fuzzy acrylic-type sweater. That's the first point. So that the fact that she was a prostitute and the fact that there were hairs on her sweater are essentially meaningless. If you assume what I said could possibly be shown by the test that the hairs' DNA. I understood that. All right. I recognize that. And what I'm suggesting is, and it goes to the second part, and the second part of it is that the condom was found at the scene 24 hours after the fact in the snow, underneath approximately an inch of snow. It was the rape itself took place inside the vehicle. It did not take place there. Given those circumstances, it is not possible to say conclusively that this particular condom was the one that was used by the perpetrator of the rape. One cannot say that. There are other possible reasons for that being there. This particular site was relatively remote, but a site where sexual trysts are known to occur. One simply cannot say that. And that's the primary reason. The other thing is you have to remember is we have a state court judge who has reviewed the entire transcript, who has expressly made findings with respect to those hairs, the very question you asked. And I guess my time is running out. I'd like to save a minute if possible. Let's hear from the other side, and you've saved a minute. Okay. Thanks. May it please the Court. My name is Peter Neufeld, counsel. I'm here to represent Mr. Osborne, the appellee in this case. It's an important occasion for us because of the issues obviously that are at play here. And, by the way, I apologize in advance because if the Court had any difficulty understanding my opposing counsel, they may have more difficulty understanding me with a Brooklyn accent, and I'm just trying to deal with that in advance. So it's not a problem. I think we're sufficiently acquainted with Brooklyn accents. Okay. The bottom line is that the test that counsel is recommending and urging upon the Court here in order to get access to evidence, and that's all we're talking about is access to evidence, is a test that not only was authored by a court that rejected the existence of a federal constitutional due process right to have post-conviction DNA testing. It is not only a rule which no other federal court in America has adopted, but perhaps most importantly and most tragically, it would be a federal rule that most of the 208 people who have already been exonerated in the United States through post-conviction DNA testing would not satisfy. And, consequently, those people, those poor souls, would still be in prison if that was the rule. Not only would they be in prison, but of the 15 people who were exonerated off of death row, people like Kirk Bloodsworth, where five eyewitnesses said he did it, clearly couldn't meet that high standard, five eyewitnesses, but now DNA testing not only exonerates him but identifies the real perpetrator. He wouldn't have made it. Instead, he would have been executed. And that's the kind of test that they want, and that's the kind of test which is constitutionally unacceptable. Let me very quickly get to the evidence, because I noticed that you did have some specific questions about the evidence, and I do think counsel is confused. I think the court's questions were right on the money there. Because here's the simple scenario. Scenario is two men, Jackson and Osborne, abduct the woman and take it to a deserted road. It's been snowing out. It's Alaska. It's the end of that road. Okay? They take her there, and they rape her. And she says it wasn't Mr. Jackson that raped me. It was the other guy, the passenger. That's our client, Mr. Osborne. She says that a blue condom was utilized to accomplish the rape. And later on, okay, she takes the police back to the scene the following day, and it's not a scene with, like, condoms lying all over the place. It's a scene where they find in the snow the woman's gray sweatpants, all covered with blood, her own blood. They cover shell casings that were used in the commission of the crime because a gun was fired at her. And they fire it, and they find in the same vicinity of those two items the blue condom, the blue condom which became a pivotal piece of evidence in the prosecution's case. And it is somewhat disingenuous to stand here before Your Honors and say, oh, that evidence isn't so significant, when, in fact, that district attorney, who's represented by counsel, made the following argument in this summation to the jury. Quote. I'm talking from page 139 of the record. The condom found at the scene. Without Kimberly, Kimberly was the victim, We wouldn't know that the blue condom was in her purse. You wouldn't know it was hers. But you have a blue condom with Osborne's semen in it at the scene, right by where they found the shell casing and the tire tracks, the same area. You've also got Osborne's pubic hair on that condom. That condom had epithelial cells on the outside of it. Now, you're going to hear, okay, more than one person could have the same DQ alpha type. More than one person can have the same hair. But, ladies and gentlemen, listen. I ask you, what are the chances that those two would come up together on the same condom? What are the chances that someone around, walking around out there, with not just the same DNA type in the semen and not just the same hair, but both in the same person together? And I submit to you, the odds of that are minimal. There's two pages of summation expended on how powerful the semen in the condom was and the pubic hair on the condom. Can we stop there? Can we stop there just a second? Sure. If we had another case, we might argue that there were multitudes of facts floating around, that there were multitudes of ways that the crime could have happened. But it seems to me what you're saying, and I want to make this clear, is that the prosecution locked up this case and this prosecution on one set of facts. And they all revolved around the fact that there was a rape, there was one condom, there were the pubic hairs, and there was one passenger, and the passenger was identified as a rapist, period. The next step is we now have a 1983 action to reexamine that exact semen that was introduced by the state. And that's the only thing that's happening in this case. We're not changing any condom positions. We're not changing any hair positions. We're not even changing any people. All we're saying is you want to take another look at the semen with new technology. Is that what this case is about, that access to that? That's all it's about. In fact, Your Honor, it's the same kind of argument that was used by Justice Kennedy just last year in House v. Bell. When he said when they got a DNA exclusion on semen on the deceased nightgown, he said, but this was the prosecution's theory of the case. And now DNA testing has undermined an important fact in the prosecution's theory of the case. So I understand that. If we remove that semen connection, and also let's say maybe the hair connection, DNA, from your client, that leaves a big void in the defendant's, in the prosecution. In fact, it removes the defendant from the case according to the way they prosecuted the case. Well, it does more than that. Not just does it remove, not only does it remove a big piece of their evidence, but counsel is missing one very critical scientific point here, when she says that there's always a possibility that that condom came from some unrelated incident. Aside from the fact that it's the only blue condom out there, it's the only condom out there, and it's found next to the victim's sweatpants and the shell casings. If you look at the summation, the summation says not only is there semen on the inside of the condom, but there are epithelial cells on the outside of the condom. And then they go on and argue in summation, and of course you know what that means. That means the condom was inside the woman's vagina. That's what it means. When you do DNA testing now, not only will you be able to do DNA testing on the semen, but you'll do DNA testing on the epithelial cells on the outside of the condom. If it matches the victim, if it matches the victim, then we know to a scientific moral certainty that that condom was used in that rape of that victim, end of question. And there will be no more doubts. There will be no more nothing. There's no alternative theories. That's the end of it. It would be conclusive. And as I found in the record, there was mention of the fact that those epithelial cells were found on the outside of the condom, but we could not find anywhere in the record that anybody tested it. Apparently it wasn't able to, but it just seems to be a void in the record about that evidence. Good point. There is. It wasn't tested. But now, given state of the art, what this Court referred to in the Kincaid case, the gold standard of DNA testing, in all likelihood they'll be able to do DNA testing on those epithelial cells and determine to a moral certainty that they match the victim. To get that access, why don't we get to the point, then? What standard should we articulate? The standard. Well, the standard we believe should be the materiality standard of Bagley and Brady, which is a reasonable probability of a different outcome, and here's why. We agree that in a post-trial context, it is somewhat narrower than it would be pretrial under Brady, and it would be our position that the two ways it would be more restrictive are as follows. For instance, in a pretrial situation under Brady, you would be entitled to not just evidence which goes directly to innocence, but also evidence which tends to impeach, so-called giglio material. In a post-conviction situation, it's more restrictive. You don't get giglio material. You only get evidence that goes to the heart of the case, that goes to innocence. Let me ask you this. Yes. I can see why you're arguing for a reasonable probability standard here, because at least as I understand the facts, you can make a pretty good argument that you satisfy the reasonable probability standard. Why should that be the standard for all cases? That is to say, why shouldn't it be sufficient that at the time of seeking access, and only access, that it's a reasonable possibility? Well, you know, in one sense- What you're doing here, obviously, if we set the standard saying this is the standard, unless we say, well, assuming that this is the standard, I mean, we're setting the standard not only for this case, but for a whole lot of other cases. I'm not sure you're-I'm trying to think of other cases in which maybe reasonable possibility is the more appropriate standard. And I can see cases where that would be the situation. For instance, if you look at Judge Calabresi's discussion of this whole issue in the McKithing case, which was decided in March of 2000 in the Second Circuit, where, like you, they reached the heck issue, and then they remanded it, and it's on remand right now, but he offered guidance and instructions to the district court on how to handle the due process issue. And he said, you know, there's a compelling argument to be made that perhaps it might be more expansive, it might be broader than the vaguely reasonable probability, because I can see the situation where you're not necessarily going to go back into a state court and move for a vacatur because you might not make that burden. However, there might be enough evidence that you'll seek executive clemency, that you'll seek some kind of commutation of a sentence or some kind of more favorable treatment, which doesn't rise to the level of vacatur, but still gets you the evidence. And in those situations, perfectly, it makes perfect sense to say that a reasonable possibility would be enough just to get the testing. Of course, in this case, we don't have to go there, do we? We're setting maybe the highest standards of what you're talking about. You shouldn't go above this for my client under these specific circumstances of this case. You wouldn't object to something lower than that. You're just saying this is probably the highest you were willing to say the standards should be for the circumstances of the case and the circumstances of having a chance to reexamine the DNA. I would say yes in this case. I don't need more than that, obviously. I mean, we don't have to decide every case here. We know what your case is like. Right. And you're saying that under that standard, that it would show, would give you the results it could show as innocence. Judge Bonetti, I would be not dishonest, but certainly if you knew that I'm not only sitting, standing here as Mr. Osborne's lawyer, but also as the co-director of the Innocence Project and thinking about the big picture and the consequences of the decision that emanates from this Court, obviously I'm concerned with other issues as well. But you're certainly correct, sir, that for this client in this case, given the fact that they did rely on that semen and hair to convict him. Well, B, we're going to be going a lot of places with this, undoubtedly. It seems to me that if we start out with the case as yours, it's so tight we can write it narrowly and still show what kind of standard we have to have under these circumstances. There could be other circumstances, as you've listed. I'm not going to second-guess you on how you do something like that. I'm just trying to see if you're trying to argue for a solid standard of some kind, other than the fact that this may be a bit flexible, because it's highly, again, if we go back to that actual innocence dialogue that the courts have been having, it all turns on the facts of the case. We never even get to finding out if there's even actual innocence until we explore the facts. Well, but the whole notion of actual innocence or the Schlupf standard has no relevance to this court in this situation. Those are cases where you're actually trying to get the ultimate relief. And as you pointed out earlier in the argument, we're not trying to get the ultimate relief here. We just want access to the evidence. If we get a good test result, Mr. Osborne intends to go back into state court in Alaska and file a Rule 33 under Alaska law. But in Herrera and Schlupf, you're looking at the ultimate question of vacating a conviction. We're not there. We're working on a Brady plus here. And we're not using Brady because Brady has a little more relaxed standard pretrial. We're in post-trial with Brady. And we could go to the top and say, as the appellate court in Alaska said, and say actual innocence. But you're saying, no, we shouldn't do that. I'm saying you shouldn't do that, and it should remain reasonable probability, at least for my client. And what I'm saying is if the court is concerned that someone might say in a post-conviction context, since there is, although there's a liberty interest, it is somewhat diminished, then you can somehow diminish the so-called Brady right of access to evidence in two ways. One is only evidence which goes right to innocence as opposed to impeachment. And, two, sort of ignoring Ager's expansion of Brady, only evidence where the litigant himself specifically asks for the evidence. So you don't put a proactive duty on the prosecutor. The defendant has to be the moving party. So we could live with that kind of restriction, and I think all the appellate courts in the country hopefully could live with that kind of distinction between pretrial Brady and post-conviction Brady. That would be our hope. You know, there are other courts dealing with this exact issue that you're dealing with right now. And what it really comes down to, it's not all evidence either. It's an acknowledgment that we have a revolution in the criminal justice system occasioned by the invention of DNA testing, that it is qualitatively different than all those other kinds of evidence, that their suggestion that finality is an important thing. Yeah, finality is important. But the reason finality was always so important is that the kinds of evidence that people would come up with 10 or 20 years later wasn't that reliable, a recantation, a new eyewitness. But what we know now and what the U.S. Department of Justice said in the Commission on the Future of DNA Testing unequivocally is that DNA evidence, even 20 years after the fact, is more reliable than all the other kinds of evidence used to convict somebody. And we're in a different world here. We're dealing with no claim of trial error. We're dealing with the fact that the technology has outstripped what we can do, and we now have to readjust to determine what do we do when technology changes the result or possible result of what happened in what was apparently a fair trial. I agree with that. And that makes a difference here, doesn't it? It makes a huge difference. And all we're saying is, and I think what the Supreme Court said in Matthews, is that due process is not static. It's fluid. And obviously the appropriate due process standards for this case, for Mr. Osborne, so he can get access to the evidence and do the darn test, might be different than the quantity or quality of due process for another person seeking DNA evidence under other circumstances. Let me ask you this. I understand that in this case your client is willing to pay for whatever DNA testing would be done. Ms. Simel suggested, however, that if there's a constitutional right to access, that it might be hard to limit it to defend answer, I should say, 1983 plaintiffs, who are willing to pay for the testing. What's your response? Well, a couple of things, Your Honor. One is, first of all, the Innocence Project, Mr. Osborne was indigent, but the Innocence Project agreed to pay for the testing. It is the practice of the Innocence Project to pay for the testing for any indigent person who wins the right for post-conviction DNA testing in the United States of America. I'm just answering that on a practical level. But I'm asking, okay, hypothetically, you go bankrupt. Well, we have our friends out here. But beyond that, okay, the test itself is not prohibitively expensive, and if you do a strictly fiscal cost-benefit analysis, it's overwhelmingly tipped on our side for the following reasons. It costs $25,000 a year to house somebody in prison. If you do a DNA test for a couple of thousand dollars or $3,000 even, the high end, and it excludes them, you're saving the state a lot of money. If you not only exonerate somebody with DNA testing, but as we did in about 40% of our cases, go on to identify the real perpetrator, and you take that real perpetrator off the street who's committing all these other serious violent crimes, you've saved the state a fortune. So just in terms of dollars and cents, if the state did have to end up paying a few thousand dollars to satisfy, and by the way, it's only a handful of people. There's no floodgates that are breaking here. In New York, we've had the statute the longest. We average five or six requests a year. Illinois, seven or eight requests a year in the whole state. Are those statistics in the record? I don't know if they're in the record. They're in the United States Department of Justice publication, and they may be. What I'm getting at is if we're going to get into the – are we going to have to get into this cost issue? It seems to me that's a slippery slope. Let's assume that we say that we'll take the record as it stands. I don't know that in the record it shows the impact of the cost. We may have to send it back to the district court to figure that out. And additionally, even though you're backing certain tests, that means it's to your discretion, a private institution, as to who gets these tests. So how can we constitutionally set a standard for everybody based upon your discretion? You may not want to do that. I'm not asking you to go there in this case because in this case it is part of the record that Mr. Osborne will pay for the testing and so there is no financial burden on the state, period. Okay? And that's the state of the record here. And in fact, that's the record that the district court judge relied upon when he said, I do believe he has a constitutional right to have access to the evidence because three things exist. One is he's willing to pay for it. Two, the testing wasn't available when he went to trial a long time ago. And three, there's a reasonable probability of a different outcome. It leaves the question open for another day if there's someone who wants it who can't pay for it. That is correct. And I'm not in any way advocating any more remands back to the district court here. I think the record is complete enough that this court can decide once and for all whether Mr. Osborne gets access to the evidence so we can do DNA testing. Could I break in with kind of a mundane jurisdictional question? There's an ambiguity in the briefs. On page 25 of the state's brief, they assert that Osborne is now pursuing and means to have samples of the issue tested without the intervention of federal courts because he's currently litigating the matter in the state court. I couldn't find a direct response to that except that in Osborne's brief, he contends that the state has denied him access, but I'm not sure he's exhausted his remedy or that the case is really Article 3 case or controversy if it's not over at the state. He hasn't exhausted or hasn't concluded the state litigation. Three things, Judge Goodwin. One is that I don't believe there's an exhaustion requirement for 1983 as a matter of Supreme Court law. Number two, he was actually litigating these issues in the state court when he was here last time on the Heckley-Humphrey issue, and the court did not find that to be a barrier at all. In fact, the court found that 1983 is separate and apart from whatever post-conviction action he's doing in the state court because that's part of their state habeas. Well, I'm getting to the Article 3 question. If he's still got a case going in the state court, why should a federal court take off without a payload? He may win on the state court for all we know. Well, he lost. He not only lost in the trial court, in the Superior Court. He then lost in the Intermediate Court of Appeals. There's a subsequent submission, I think, which you received from Counsel for Alaska, how the Intermediate Appellate Court recently affirmed, because it held, that Mr. Osborne could not meet that very high burden, the burden of, and by the way, that burden is conclusive evidence of innocence. Now, is that appealable to the Alaska Supreme Court? It's appealable to the Alaska Supreme Court, and I think local counsel in Alaska has sought leave, but I don't believe that the decision in the habeas case has any Article 3 significance for the jurisdiction of this panel. Well, there may be a right in this question, but we can work that out among ourselves, I think. I didn't want to waste all or use all of the time this afternoon on the nature and quality of the right that is being claimed out here unless we have jurisdiction. Thank you, Judge. Following that up and following Osborne 1, we assumed, if you will, then, that we had jurisdiction, and we decided that there was a cause of action in 1983 to see if you could get access to this material to see where you're going to go next. If you have the right to get the access where you go next, whether it be clemency, whatever, with this material, it doesn't seem to be the issue in this appeal that I can see anywhere. I agree with you, Your Honor. And, in fact, as I've already said, it would be the intent of Mr. Osborne, if he gets a good result with the DNA testing, to go back into Alaskan state court and use their procedures and use their rules of finality to see whether or not he can vacate the conviction. Yeah. Well, we'll have to look at that jurisdiction issue. But the key here is we're trying to get access, and if you get access, I don't know what you're going to do with it. That's not this case. Any further questions from the bench? Thank you very much. Thank you very much. Your Honor, I'm sorry. I would almost invite the court to or invite counsel to answer the one question, which is if you do DNA testing, as the judge pointed out, not just on the semen, but also on those epithelial cells outside, and it identified that they came from the victim. So it's very clear that that is the condom and the pubic hair from this rape. Would that not be a reasonable probability of a different outcome had a jury seen that? Okay. Thank you. You saved a minute, and the opposing counsel went over a little bit. So we'll give you a couple of minutes and see where we are. I don't have a whole lot, but I'm sorry, I really am short. First, with respect to the pending proceedings in State court, I'd just like to clarify what the record for what they are is that Mr. Osborne has filed what's called a petition for hearing with the Alaska Supreme Court. And, yes, the Alaska Court of Appeals did affirm the Alaska Superior Court's findings on remand with respect to the test that they articulated. And he has filed a petition for hearing, and certainly it remains to be seen. The State has not yet filed a response to that petition. And once that occurs, the Alaska Supreme Court will rule on whether or not it will take it and require further briefing. And certainly if there's the possibility of reversal, and certainly if it is affirmed again, he's got the possibility of seeking a petition for cert with the United States Supreme Court. So, yes, there are remedies still available within the proceedings that he instituted initially in State court. So I'd like to just state that. And with respect to the epithelial cells on the outside of the condom that Mr. Neufeld referred to, I would state that one needs to remember that there was no testimony that she'd never, ever been out there. There was testimony that that was not the usual place the victim went when she was working. But there was no testimony whatsoever. The record is just silent on that fact. So I would still submit that there is no evidence anyway that would make this conclusive if the testing results were favorable. And that would be the position that we take. I would say that the test employed by Judge Beislein was way too broad if this Court is to find a right of access. And the other point I'd like to make is that what Mr. Osborne is advocating for is just a freestanding right of access for whatever purpose he deems to use it. And I think that that's, looking at it that way, it's an overly broad right. One has to consider it in the context of what it's being used for, because the standard has to relate to the context. One thing that the Alaska Court of Appeals said that I think has been overlooked, and I think it's important to recognize, is that if the motion had been made post-trial, within the 180-day period of the conviction being entered, the standard would have been lower. As one gets further away from the conviction and the State's interest in finality becomes greater due to the passage of time, the standard needs to be greater. And for that reason, I would submit that the standard, if this Court is to find any right at all, needs to be extraordinarily high. Thank you very much. Okay. Thank both parties for their helpful argument. The case of Osborne v. District Attorney's Office 06-35875 is now submitted for decision, and we will be in recess.
judges: Goodwin, Brunetti, Fletcher